The CONNECTICUT FUND FOR the ENVIRONMENT, INC., Petitioners,

and

City of Middletown, Connecticut, Intervenor,

v.

ENVIRONMENTAL PROTECTION AGENCY, Anne M. Gorsuch, Administrator, Environmental Protection Agency, Respondents,

and

State of Connecticut, Intervenor.

No. 6, Docket 81–4202.

United States Court of Appeals, Second Circuit.

Argued Sept. 15, 1982.

Decided Dec. 1, 1982.

E. Donald Elliott, Associate Professor of Law, Yale Law School, New Haven, Conn., for petitioners.

Jeffrey Fowley, Boston, Mass., U.S. Environmental Protection Agency (Carol E. Dinkins, Donald W. Stever, Jr., Diane L. Donley, U.S. Dept. of Justice, Environmental Defense Section, Land and Natural Resources Div., Washington, D.C., Catherine A. Cotter, Robert M. Perry, Lydia N. Wegman, U.S. Environmental Protection Agency, Washington, D.C., of counsel), for respondents.

Kenneth N. Tedford, Asst. Atty. Gen., State of Conn. (Carl R. Ajello, Atty. Gen., State of Conn., Robert A. Whitehead, Jr., Asst. Atty. Gen., of counsel), for intervenor, State of Conn.

Francis O'Neill, City Atty., City of Middletown, Conn. (on the brief), for intervenor, City of Middletown, Conn.

Before FEINBERG, Chief Judge, and FRIENDLY and KAUFMAN, Circuit Judges.

FEINBERG, Chief Judge:

This is a petition under the Clean Air Act (the Act) to review a final rule of the Environmental Protection Agency (the Agency) approving a revision to Connecticut's State Implementation Plan (SIP) for sulfur dioxide. 46 Fed.Reg. 43,418 (1981). The revision establishes the Air Pollution Control/Energy Trade Option Program (Energy Trade Program), which allows sources that conserve fuel to burn less expensive fuel containing a higher percentage of sulfur than is otherwise permitted by the SIP. Petitioner The Connecticut Fund for the Environment, Inc. (the Fund) and intervenor City of Middletown, Connecticut contend that the approval of the Energy Trade Program violates § 110(a)(3) of the Act, 42 U.S.C. § 7410(a)(3)(A).[1] For the reasons stated below, we deny the petition.

## I. Background

We have already set out the complex provisions of the Act, 42 U.S.C. §§ 7401–7642 (Supp.1981), in a companion case, *The Connecticut Fund for the Environment, Inc. and American Lung Association v. Environmental Protection Agency and State of Connecticut*, 696 F.2d 169 (*Connecticut Fund II*). We will therefore review the statutory framework of this case only briefly, and refer the reader to the companion case for greater detail.[2]

The Act directs the Agency to promulgate a primary and a secondary National Ambient Air Quality Standard (NAAQS) for various pollutants, including sulfur dioxide ($SO_2$) and total suspended particulates

---

1. For convenience, we sometimes refer to petitioners as the Fund and to respondents as the Agency.

2. We have tried to keep the use of acronyms to a minimum in this opinion. To aid the reader in understanding those that remain, we have appended a glossary.

(TSP), which are at issue in this case. The states are required to submit for Agency approval SIPs for "implementation, maintenance, and enforcement" of these standards. 42 U.S.C. § 7410(a)(1). The Agency must approve a SIP if it determines that it was adopted by the state after reasonable notice and hearing and that it fulfills eleven specific requirements. 42 U.S.C. § 7410(a)(2)(A)–(K). The same is true for revisions of SIPs. 42 U.S.C. § 7410(a)(3)(A). By August 28, 1981, when the Agency published the final rule at issue here, Connecticut had attained both the primary and the secondary NAAQSs for $SO_2$. 46 Fed.Reg. 43,420 (1981). We were informed after oral argument that on September 23, 1982, the Agency announced that the state had attained the primary (but not the secondary) NAAQS for TSP. 47 Fed.Reg. 44,263 (1982).

Part C of the Act, 42 U.S.C. §§ 7470–7479, imposes requirements for the prevention of significant deterioration (PSD) in areas where the air is cleaner than required by the NAAQSs. Part C provides for the establishment of a "baseline" level of each pollutant for which the area is in attainment, and forbids any new construction or modification of a major source of that pollutant that will raise the level of the pollutant above a stated increment.

## II. This Case

As already indicated, the SIP revision challenged in this case will reward sources of pollution that conserve fuel by allowing them to burn fuel containing a higher percentage of sulfur than otherwise permitted by the SIP. Since Connecticut adopted its unusually strict sulfur-in-fuel limitations in 1972, 37 Fed.Reg. 10,842, the level of $SO_2$ in its air has declined to well below both the primary and the secondary NAAQSs. While this undoubtedly benefits the health and welfare of state residents, it also imposes certain burdens—most notably the markedly higher price of lower-sulfur fuel. The

Energy Trade Program recognizes that energy conservation can be used as an alternative means of pollution control and that this can be done by a variety of strategies, including energy efficiency, decreased fuel use and fuel switching. Certainly, any decrease in the amount of fuel burned will result in a reduction of pollution emissions. Thus, if sources that cut down the amount of sulfur-containing fuel they burn are permitted to offset the resulting reduction in $SO_2$ emissions by using cheaper, higher-sulfur fuel, they will save money and energy while Connecticut's air still remains as clean as, or cleaner than, the NAAQSs for $SO_2$ require.

The Energy Trade Program establishes procedures by which sources may apply for permits to switch to higher-sulfur fuel. The applications will be reviewed simultaneously by the state and the Agency; only the state will provide a public notice and comment period, although the Agency will review the written comments submitted to Connecticut. 46 Fed.Reg. 24,600–01 (1982). See also id. at 43,421. The analysis requires two steps. First, the maximum allowable percentage of sulfur in fuel for the "premise"[3] is calculated by a formula that permits emission of 0.55 pounds of $SO_2$ per million British Thermal Units (BTUs) consumed by the premise. Agency-approved models are then used to determine whether burning the maximum sulfur in fuel at the premise would cause or contribute to violation of the primary or secondary NAAQS for $SO_2$ or TSP, and the allowable percentage would be reduced as necessary. Each application is also screened for its impact on air quality in areas for which a baseline has been established under Part C of the Act. Thus, by decreasing its use of energy—i.e., its input of BTUs—a plant would be able to increase its emissions, but only if this did not cause violation of the NAAQSs or significant deterioration in areas with established baselines.

---

**3.** Connecticut defines this term as follows:

A premise is the grouping of all pollutant emitting activities or sources at one location and owned or under the control of the same

person or persons. Premise emissions are the total emissions from all stacks, chimneys, flues, and other vents to the ambient air located on the premise.

The Energy Trade Program has also been called the "BTU Bubble" program, because rather than analyzing the emissions of a premise smokestack-by-smokestack, it examines them as though the premise were inside a giant bubble with one smokestack. See *NRDC v. Gorsuch,* 685 F.2d 718 at 725–728 (D.C.Cir.1982), hereinafter cited as *NRDC v. Gorsuch.* It is not clear from the record whether the bubble concept is to be used only in the first step of the analysis, in which the maximum allowable percentage of sulfur in fuel is derived from the total allowable $SO_2$ emissions, or whether it will also be used in the second step, the adjustment of the percentage to avoid violations of the NAAQSs.

On July 16, 1980, Connecticut published a notice of a public hearing to be held on August 20, 1980 on the updating of its SIP and the inclusion of the Energy Trade Program. The Fund and other groups and citizens of Connecticut participated in the hearing, and the Fund submitted written comments. The proposed revision was submitted to the Agency in December 1980 and, after a public comment period during which the Fund and others responded to the proposal, was approved on August 28, 1981. 46 Fed.Reg. 43,418. In October 1981, the Fund filed this petition for review of the August 28 approval, naming the Agency and its administrator, Anne M. Gorsuch, as respondents. This court has permitted intervention by the City of Middletown as a petitioner and by the State of Connecticut as a respondent.

Petitioners raise three issues in this court. They contend (1) that the revision constitutes a relaxation of Connecticut's SIP for TSP that is impermissible under 42 U.S.C. § 7410(a)(2)(B) and *NRDC v. Gorsuch,* supra; (2) that the revision fails to satisfy 42 U.S.C. § 7410(a)(2)(J) because it does not meet the PSD requirements of Part C for $SO_2$; and (3) that Connecticut did not provide the "reasonable notice" required by 42 U.S.C. § 7410(a)(3)(A). For these reasons, petitioners claim that the Agency abused its discretion under the statute in approving the revision, and urge us to set that approval aside.

### III. Standard of Review

As a preliminary matter, it is worth repeating what we have already stated in *Connecticut Fund II* about the standard of review to be used in evaluating the Agency's approval of a SIP revision. A reviewing court should uphold such administrative actions unless they are found to be " 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' " *Friends of the Earth v. USEPA,* 499 F.2d 1118, 1123 (2d Cir.1974) (quoting 5 U.S.C. § 706(2)(A)). Of course, the statutory provisions at issue here delineate the Administrator's duties quite specifically. Section 7410(a)(3)(A) directs her to approve any SIP revision that was adopted after reasonable notice and hearing and that fulfills the eleven detailed criteria of § 7410(a)(2)(A)–(K). But considerable expertise is required to determine whether a revision meets those criteria, and it is particularly appropriate to defer to the interpretations of the agency charged with administering the statute at issue.

### IV. The TSP Problem

Petitioners argue that the Agency may not approve any revision to a SIP without examining its effects on all pollutants for which NAAQSs have been established. Since TSP is emitted when fuel containing sulfur is burned, the Fund argues that the increase in sulfur in fuel allowed under the Energy Trade Program will aggravate Connecticut's TSP problem; therefore, they conclude, the program fails to satisfy the requirement of 42 U.S.C. § 7410(a)(2)(B) that SIPs (or revisions of SIPs) "insure attainment and maintenance of such primary or secondary standard."

A similar argument was raised in *Connecticut Fund II.* There, we approved the Agency's interpretation of the statutory language to allow separate consideration of the SIPs for different pollutants. Here, too, the Agency regards the revision as affecting Connecticut's SIP for $SO_2$, and maintains that it is not required to assess the impact of the revision on TSP levels in

Connecticut before approving the revision. For the reasons indicated in *Connecticut Fund II,* we conclude that the Agency's view is a reasonable construction of the Act.

■ However, there is an additional reason in this case for concluding that the Agency did not abuse its discretion in approving the revision to the SIP. As respondents point out, the Energy Trade Program approved on August 28, 1981 does not by itself permit the burning of higher-sulfur fuel; rather, it establishes the procedures by which individual sources may receive permission to do so. Each individual permit will be treated as a separate SIP revision. Before a variance is granted, both Connecticut and the Agency must be satisfied, through mathematical modeling, that the increased sulfur in fuel will not cause or contribute to any violations of the NAAQSs for either SO₂ or TSP. (An increase in TSP will be considered to contribute to the current violation only if it is "significant," a term that is mathematically defined.) Thus, in adopting the Energy Trade Program, Connecticut has exercised its option under 42 U.S.C. § 7416 to enact air pollution controls that are stricter than those mandated by the Act. See *Union Electric Co. v. EPA,* 427 U.S. 246, 262–66, 96 S.Ct. 2518, 2527–2529, 49 L.Ed.2d 474 (1976). Even though it is not required to consider the TSP effects of Connecticut's SO₂ revision, the Agency will accommodate Connecticut's decision to do so by helping it to ensure that no variance under the program will result in significant increases in TSP emissions.

■ Petitioners object also to the decision to permit "insignificant" increases in TSP. Since we conclude that the Agency need not consider TSP at all, a fortiori we cannot disapprove the Agency's consideration of significant increases only. But in any case, the Agency must be allowed some discretion to disregard de minimis increases: "Courts should be reluctant to apply the literal terms of a statute to mandate pointless expenditures of effort." *Alabama Power Co. v. Costle,* 636 F.2d 323, 360 (D.C. Cir.1979). We are satisfied that Connecti-

cut is striving conscientiously to ameliorate TSP pollution. As we have noted, it has already met the primary NAAQS for TSP. It has also tightened its TSP emissions limits in regulations recently approved by the Agency. 47 Fed.Reg. 41,958 (1982). Finally, as we mentioned in *Connecticut Fund II,* the Agency is of the view—and we cannot say it is an unreasonable one—that sulfur-in-fuel limitations are not an efficient means of reducing TSP. In light of all this, it does not seem unreasonable for Connecticut to permit minor increases in TSP from sulfur-emitting sources. Thus, even if the Agency were required to consider the impact of the Energy Trade Program on TSP, we would have to conclude that its approval of the Program was within its discretion.

A related question has arisen as a result of the D.C. Circuit's recent decision in *NRDC v. Gorsuch, supra.* In that case, the court held that the Agency may not define "source" as an entire plant for purposes of the new source review program. The court interpreted prior case law to say that the bubble concept must be used with respect to pollutants for which the NAAQSs have been attained, but may not be applied where they have not. Petitioners urge us to find that the Energy Trade Program is impermissible under this decision. Connecticut did compare the Energy Trade Program to the bubble regulations at issue in *Gorsuch* in the description it submitted to the Agency:

In effect this interpretation assumes that the entire premise in the aggregate would be allowed to key its emissions of sulfur oxides to the total of all the energy inputs into or within the premise. This can be viewed as a limited application of EPA's recently announced "Bubble" policy in which EPA suggests that instead of focusing on individual sources of emissions within a premise (such as individual stacks, vents or other emission points) the premise should be viewed as if it were contained within an imaginary bubble that has a single stack; as long as the emissions from the single stack at the top of the bubble achieve the plant's air qual-

ity requirements, the premise may use whatever mix of controls it wishes inside the bubble.

Moreover, it does appear that the Energy Trade Program has the same overall effect as the *Gorsuch* regulations: At least in the first step of the BTU analysis, in which the maximum allowable percentage of sulfur in fuel is derived from the total BTU input, a plant can apparently juggle the $SO_2$ emissions from different smokestacks so long as its total $SO_2$ output does not exceed the Energy Trade Program's limit. But Connecticut's comparison in its description is not necessarily controlling, see *Connecticut Fund II,* nor can we lightly disregard the view of the Agency, which originated the bubble concept, that the Energy Trade Program is distinguishable from the *Gorsuch* bubble program because it trades energy conserved for emissions rather than emissions for emissions.

In any event, we need not decide this issue. It would be perfectly permissible under *Gorsuch* to use a bubble concept in the first step of the Energy Trade Program, because Connecticut has attained the NAAQSs for $SO_2$. *Gorsuch* forbids bubbling only when a NAAQS for the pollutant in question has not been attained. Only in the second step of the BTU analysis does TSP—the pollutant for which Connecticut has not attained the secondary standard—come into play. It is not entirely clear from the record whether the Energy Trade Program will use the bubble concept in its modeling for possible aggravations of the TSP violation. But since we have been given no persuasive reason to believe otherwise, we assume that the Agency will follow its usual procedure, i.e., that approval of any plant's participation in the Program will depend on smokestack-by-smokestack compliance with the emission limitations imposed by the state to ensure compliance with the NAAQSs for TSP. If this is so, the Program complies with the ruling of *Gorsuch.*

### V. Prevention of Significant Deterioration (PSD)

Petitioners also contend that the Energy Trade Program should not have been ap-proved because it fails to meet the requirements of Part C (relating to PSD). 42 U.S.C. § 7410(a)(2)(J). Under Part C, once an area has attained the NAAQSs for a given pollutant, a permit is required for construction of a new "major emitting facility," (defined in 42 U.S.C. § 7479(1)), or for modification of an existing "major emitting facility." 42 U.S.C. § 7475(a). A permit will issue only if it is determined, among other things, that the change will not cause or contribute to an increase in the level of that pollutant that exceeds the increment allowed by 42 U.S.C. § 7473. 42 U.S.C. § 7475(a)(3)(A). The increase is measured against the "baseline concentration," defined as "the ambient concentration levels which exist at the time of the first application for a permit in an area subject to this part." 42 U.S.C. § 7479(4). The Agency argues that the Energy Trade Program fully meets these requirements by providing that each application under the program will be screened for any effects on air quality in areas for which a baseline concentration has been established. (In fact, no baseline has yet been established in Connecticut for $SO_2$.)

The Agency first developed PSD regulations in 1974 in response to the mandate of *Sierra Club v. Ruckelshaus,* 344 F.Supp. 253 (D.D.C.1972), aff'd per curiam, 4 E.R.C. 1815 (D.C.Cir.1972), aff'd by an equally divided court sub nom. *Fri v. Sierra Club,* 412 U.S. 541, 93 S.Ct. 2770, 37 L.Ed.2d 140 (1973), that the Agency not allow significant increases in pollution in areas where the air is cleaner than required by the NAAQSs. 39 Fed.Reg. 42,510 (1974). Congress endorsed and expanded the PSD program by adding Part C to the Clean Air Act as part of the 1977 Amendments to the Act.

Section 7478 provides for the transition between the 1974 regulations and those under the statute:

Until such time as an applicable implementation plan is in effect for any area, which plan meets the requirements of this part to prevent significant deterioration of air quality with respect to any air

pollutant, applicable regulations under this chapter prior to enactment of this part shall remain in effect to prevent significant deterioration of air quality in any such area for any such pollutant except as otherwise provided in subsection (b) of this section.

42 U.S.C. § 7478(a). Petitioners maintain that the 1974 regulations are still in effect in Connecticut, and that the Energy Trade Program fails to comply with them.

■ We disagree. First, it is simply not true that, as petitioners argue, the Connecticut SIP has not been effectively modified to comply with Part C. Since Connecticut itself did not make the necessary changes, the Agency incorporated the PSD requirements into the SIP through its authority under 7410(c)(1). 45 Fed.Reg. 52,741 (1980). Second, the argument that no SIP containing a PSD program can be in effect until a baseline concentration is established, so that the old regulations remain in force in Connecticut, is contrary to the decision in *Alabama Power Co. v. Costle,* supra, 636 F.2d at 374–76. That case held that the statute requires baseline concentrations to be established upon the filing of the first permit application under the PSD program, even though this might allow air quality to decline until the baseline is triggered. Id. at 375. The Agency had tried to avoid this statutory loophole by establishing a uniform baseline date of August 7, 1977. 43 Fed.Reg. 26,400 (1978). But the D.C. Circuit would not allow the Agency to overrule what it saw as a "clear, consistent congressional directive." 636 F.2d at 375. The court concluded that when Congress enacted Part C, it intended that PSD requirements be suspended until the first application was made. It is thus futile for petitioners to argue in this case that Congress must have intended the 1974 regulations to remain in effect until the baseline concentration was established. The requirements of § 7410(a)(2)(J) are fully met by the Energy Trade Program's provision for PSD review of applications that will affect areas for which baselines have been established.

## VI. Notice

■ Petitioners' final objection to the Agency's approval of the revision is that Connecticut's notice published on July 16, 1980 was inadequate. A revision to a SIP becomes effective only after two levels of review. First, the state holds public hearings and adopts the plan; then the Agency's rulemaking procedure, including public comment, takes place. One of the criteria that the Agency is required to apply when considering a plan submitted by a state is whether it was "adopted by the State after reasonable notice and public hearings." 42 U.S.C. § 7410(a)(3)(A). Connecticut's notice announced a public hearing on the proposed revision, invited public participation and written comments, and provided the following summary:

The DEP [the Connecticut Department of Environmental Protection] was required to develop the State Implementation Plan (SIP) for air quality. This describes how Connecticut will attain and maintain levels of air quality sufficient to protect public health and welfare. One class of pollutants for which standards have been adopted is sulfur oxides. The primary source of emissions is the combustion of fuels containing sulfur.

In 1972 the DEP adopted the first SIP to control emissions from fuel burning sources. The DEP now proposes to further explain that Section of the SIP by updating the associated narrative portion. The Revision is descriptive only. No changes are proposed for the DEP's regulations. In addition to updating the SIP, the revision will outline a program known as the "BTU Bubble", which is based on an interpretation of existing State regulations dealing with fuel burning sources. Under this program credit may be given for reductions in the amount of fossil fuels used through the use of energy conservation measures and other energy-reducing techniques.

This program will provide the following advantages:

1. Protect applicable air quality standards;
2. Better coordinate energy and environmental programs;

3. Encourage energy conservation and reduce the on-site use of oil by promoting other energy sources, such as co-generation; and

4. Provide economic relief from fuels lower in sulfur content than local environmental conditions require.

The notice also published addresses where copies of the proposed revision could be inspected and from which they could be obtained.

 The description of the revision certainly does not make crystal-clear that the Energy Trade Program is designed to permit increased sulfur in fuel and consequently increased SO₂ emissions. Nevertheless, the notice did state that one purpose of the program was to give "economic relief from fuels lower in sulfur content than local environmental conditions require." This notice could be read either to permit burning of higher-sulfur fuel, as the Program in fact provided, or to authorize state subsidies for plants continuing to burn fuels unnecessarily low in sulfur. An alert reader would probably have understood that the latter interpretation is much less realistic than the former, as indeed several groups did, including the Fund. Moreover, as we have emphasized above, separate SIP revision procedures, including public notices and hearings, are required before any higher-sulfur fuel is burned in Connecticut. Thus, technically no changes have occurred as a result of the adoption of the Program. Nevertheless, we are troubled by the thought that there may have been citizens and groups who, had they not been misled by the notice, would have urged Connecticut to keep its air cleaner than required, and our decision to uphold the Agency's approval should not be read to condone the ambiguous notice or the Agency's acceptance of it. But the Fund, which clearly understood what was at stake and participated fully in the state as well as the federal proceedings, does not allege that it was prejudiced, nor did it object to the notice at the state level, when any defect could easily have been cured. Moreover, this revision has been through extensive administrative and judicial pro-

ceedings, and all the issues have been thoroughly explored. At this late date, the wastefulness of overturning the approval outweighs the lack of clarity of the notice, especially since it has not prejudiced the parties before this court. Cf. *Appalachian Power Co. v. EPA,* 579 F.2d 846, 851–54 (4th Cir.1978); *Mision Industrial, Inc. v. EPA,* 547 F.2d 123, 126–28 (1st Cir.1976).

## Conclusion

The petition for review of the Agency's final rule approving Connecticut's Energy Trade Program is denied.

## APPENDIX

*Glossary*

| | |
|---|---|
| BTU | British Thermal Unit |
| NAAQS | National Ambient Air Quality Standard |
| PSD | Prevention of Significant Deterioration |
| SIP | State Implementation Plan |
| SO₂ | Sulfur Dioxide |
| TSP | Total Suspended Particulates |