696 F.2d 147
 18 ERC 1417, 13 Envtl. L. Rep. 20,135
 STATE OF CONNECTICUT, Petitioner,
v.
ENVIRONMENTAL PROTECTION AGENCY, Anne M. Gorsuch,
Administrator, Environmental Protection Agency, Respondents,
and
Long Island Lighting Company, Inc., Intervenor.
The CONNECTICUT FUND FOR THE ENVIRONMENT, INC., Petitioner,
v.
Anne M. GORSUCH, Administrator, Environmental Protection
Agency, and Environmental Protection Agency, Respondents,
and
Long Island Lighting Company, Inc., Intervenor.
 Dockets 81-4217, 81-4228, Nos. 5, 13.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 15, 1982.
Decided Dec. 1, 1982.
 
 Kenneth N. Tedford, Asst. Atty. Gen., Hartford, Conn. (Carl R. Ajello, Atty. Gen., Robert A. Whitehead, Jr., Asst. Atty. Gen., Hartford, Conn., of counsel), for petitioner State of Conn.
 Suzanne Y. Langille, New Haven, Conn. (The Connecticut Fund for the Environment, Inc., Daniel Millstone, New Haven, Conn., of counsel), for petitioner The Connecticut Fund for the Environment, Inc.
 Diane L. Donley, U.S. Dept. of Justice, Washington, D.C. (Carol E. Dinkins, Asst. Atty. Gen., Dept. of Justice, Donald W. Stever, Jr., Dept. of Justice, Catherine Cotter, Environmental Protection Agency, Robert M. Perry, Gen. Counsel, EPA, Lydia M. Wegman, Acting Asst. Gen. Counsel, EPA, Washington, D.C., of counsel), for respondents.
 Maida Oringher Lerner, Washington, D.C. (Calvin R. Rafuse, Jr., Asst. Gen. Counsel, Long Island Lighting Company, Mineola, N.Y., of counsel), for intervenor Long Island Lighting Co.
 Before FEINBERG, Chief Judge, and FRIENDLY and KAUFMAN, Circuit Judges.
 IRVING R. KAUFMAN, Circuit Judge:
 
 
 1
 These challenges to a final ruling of the Environmental Protection Agency ("EPA" or "Agency") call upon us to steer a course through the labyrinth that is the Clean Air Act.[1] Few statutes present more complex problems for the nation's courts than this 120-page treatise designed to safeguard our precious air resources. And, fewer are more important. Indeed, in reaching the proper construction of the Act's requirements we must never forget Congress's aim, universally shared, for a cleaner, healthier environment. At the same time, we remain guided by the fundamental principles of law which give the EPA broad discretion as the guardian of Congress's goal. Our task is not to determine whether the EPA has been the wisest steward but only whether the Agency has violated its legislative mandate, losing sight of the chartered path to the promised land of clean air.
 
 
 2
 More than a decade ago, Congress embarked upon a bold experiment in cooperative federalism designed to protect the nation against the grave threat of air pollution. The Clean Air Amendments of 1970[2] order the federal Environmental Protection Agency to promulgate "national ambient air quality standards."[3] These standards, in simple terms, identify the maximum concentrations of specific pollutants that are determined by the EPA to be consistent with the public health and welfare. The 1970 Amendments also require each state to draft its own "state implementation plans" to ensure that pollution levels are brought and kept below the national standards.[4] All state implementation plans and revisions must be approved by the EPA.[5]
 
 
 3
 No aspect of this novel attempt to establish joint state and federal responsibility is more crucial than the provisions which guarantee that air pollution generated in one state does not disrupt another state's plans for complying with the national standards. Indeed, one purpose of the Clean Air Act Amendments of 1977,[6] which further refined the statutory scheme, is to strengthen and clarify EPA's obligation to consider carefully the interstate impact of any revision of a state implementation plan ("SIP").[7] The 1977 Amendments also outline the type of interstate impacts that are permissible.[8] Petitioners, the State of Connecticut and Connecticut Fund for the Environment ("CFE"), today ask us to determine whether the EPA complied with the stringent requirements of the 1977 Amendments when it approved a revision of New York's state implementation plan allowing five plants owned by the Long Island Lighting Company ("LILCO") to continue burning fuel of 2.8% sulfur content in Suffolk County, New York.
 
 
 4
 Our careful analysis of petitioners' challenges to EPA's action leads us to conclude that the Agency has indeed satisfied these rigorous conditions.
 
 
 5
 * This case reaches us after a somewhat intricate procedural and factual history. Its roots stretch at least as far back as July 20, 1976 when the EPA approved a one-year temporary special limitation in New York's state implementation plan permitting the use of 2.8% sulfur content fuel at LILCO's Port Jefferson Generating Facility units 3 and 4 and 2.5% at Northport Generating Facility units 1-3. 40 C.F.R. Sec. 52.1670(c)(30)(31) (1981). New York's overall environmental regulatory scheme generally authorizes the burning of only 1% sulfur content fuel in Suffolk County, but it also explicitly provides for such special limitations when granted by New York's Commissioner of Environmental Conservation and approved by the EPA. N.Y.Admin.Code Tit. 6, Secs. 225.1-225.2 (1979).[9] In 1977 EPA approved a three-year extension of LILCO's special limitation which permitted the burning of 2.8% fuel at all five plants. 40 C.F.R. Sec. 52.1670(c)(33) (1981). This extension expired on May 31, 1980.
 
 
 6
 Limits on the sulfur content in fuel are designed chiefly to minimize levels of sulfur dioxide ("SO2 ") in the surrounding air. See Connecticut Fund for the Environment v. EPA, 696 F.2d 169 (2d Cir.1982) ("Connecticut Fund II ").[10] As discussed infra at 162-166, however, percentage requirements for sulfur in fuel also help place a ceiling on the amount of total suspended particulates ("TSP") which a fuel burning source, such as a power plant, emits into the atmosphere. The State of Connecticut's and CFE's challenge to EPA's approval of New York's decision to continue permitting LILCO to burn higher sulfur content fuel centers on possible increased concentrations of these two pollutants in Connecticut's air.[11] We note at the outset, however, that because this case involves a continuation of existing practice rather than permission to increase the sulfur content of fuel, no new or additional pollution will result from the challenged Agency action.
 
 
 7
 New York's Department of Environmental Conservation ("DEC") first made clear its intention to extend LILCO's special limitation beyond the May 31, 1980 deadline in a report dated January 14, 1980. The DEC evaluation, produced following LILCO's November 1979 request for an extension and its submission of data, indicated that continued burning of 2.8% sulfur fuel at Port Jefferson and Northport would not cause a violation of the national ambient air quality standards ("NAAQSs") for sulfur dioxide in New York.[12] This original report did not consider the effect of LILCO's emissions on Connecticut or the impact of those emissions on either state's efforts to comply with the NAAQSs for total suspended particulates.
 
 
 8
 Pursuant to 42 U.S.C. Sec. 7409 (Supp. IV 1980), the EPA has promulgated two types of national standards for both SO2 and TSP.[13] As the statute requires, the Agency has established primary standards designed to protect the public health, and secondary standards aimed at protecting the public welfare. Both standards are measured in terms of pollution concentration levels and are expressed in maximum weight (micrograms) of a specific pollutant per unit volume (cubic meters) of air. Mathematical equivalents of the standards are provided in terms of parts per million ("p.p.m."). In addition, the standards are set to measure pollution concentrations over designated periods of time. For example, one primary standard for sulfur dioxide requires that the second highest concentration of that pollutant over any 24-hour period in a given year not exceed 365 micrograms per cubic meter ("ug/m[3]") or in equivalent terms not exceed .14 p.p.m. 40 C.F.R. Sec. 50.4(b) (1982). New York's analysis of the data provided by LILCO revealed that the maximum second highest concentration of sulfur dioxide over a 24-hour period created at any location by LILCO's burning of high sulfur fuel was .063 p.p.m. at Port Jefferson.[14] Based on this manner of calculation, the DEC staff endorsed extending LILCO's special limitation.
 
 
 9
 After public notice, DEC held a hearing concerning the proposed extension on February 19, 1980. No one objected to LILCO's request at that time. Neither the State of Connecticut nor CFE filed comments or in any way participated in the New York State DEC proceeding. On April 29, 1980 New York's Commissioner of Environmental Conservation entered an order extending LILCO's permission to burn 2.8% sulfur at Port Jefferson and Northport for three years from the date of the requisite EPA approval. DEC immediately submitted its proposal for approval to the EPA. The Agency, however, had taken no action on DEC's request when LILCO's special limitation expired on May 31, 1980. LILCO continued to burn the higher sulfur fuel.
 
 
 10
 On July 3, 1980 EPA published its proposed approval of DEC's request to extend LILCO's special limitation, and invited public comments on whether the extension should be approved. 45 Fed.Reg. 50,832 (1980). The notice directed the public to the rules, set forth in 42 U.S.C. Sec. 7410(a)(2)(A)-(K) (Supp. IV 1980), governing the EPA's decision to approve or disapprove revisions of state implementation plans.[15] These rules apply in this case since New York's approval of LILCO's special limitation is a revision of New York's EPA approved SIP.
 
 
 11
 In direct response, the State of Connecticut filed comments on August 29, 1980 alleging that Agency approval of New York's proposal would violate 42 U.S.C. Sec. 7410(a)(2)(E) (Supp. IV 1980). This provision establishes guidelines EPA must use in assessing the interstate impact of any state's proposed revision of its state implementation plan. In sum, Connecticut argued that New York's proposal to allow LILCO to continue burning high sulfur fuel would sufficiently harm Connecticut's air so as to violate the Clean Air Act. We will discuss this argument in detail in Part II of our opinion.
 
 
 12
 In a separate proceeding, Connecticut also petitioned the EPA on August 28, 1980, pursuant to 42 U.S.C. Sec. 7426 (Supp. IV 1980), asking the Agency to find that under New York's proposal, LILCO's emissions would contravene 42 U.S.C. Sec. 7410(a)(2)(E)(i) (Supp. IV 1980) by "preventing the attainment and maintenance" of the NAAQSs in Connecticut. 42 U.S.C. Sec. 7426, added to the Clean Air Act by the 1977 Amendments, extends to states the right to bring such petitions and requires the EPA to find a violation or deny the petition within 60 days. The EPA held hearings on Connecticut's petition on December 3 and 4, 1980. It has yet to act upon them.
 
 
 13
 The Agency did, however, investigate Connecticut's allegations. It received additional technical analysis from LILCO and the State of New York concerning the effect of the proposed revision on Connecticut's air. This analysis demonstrated that LILCO's emissions would not cause a violation of the EPA's primary or secondary standards for sulfur dioxide in Connecticut. See Analyses of Total SO2 Concentrations At Selected Sensitive Connecticut Locations, Long Island Lighting Company, April 14, 1981, J.A. at 80. EPA's evaluation also indicated that burning of 2.8% sulfur fuel at LILCO's plants would create an insignificant impact on concentration levels of total suspended particulates in Connecticut. Technical Support Document to New York State Implementation Plan Revisions Effecting [sic] the Long Island Lighting Company, EPA--Region II, August 12, 1981, ("EPA Technical Support Document"), Attachment A, J.A. at 233. EPA then extended the comment period until June 19, 1981, to allow the public to respond to this new technical material. 46 Fed.Reg. 27,501 (1981). Connecticut submitted supplemental comments on June 17, 1981, again challenging New York's and EPA's conclusions. In its own technical report EPA responded to the various contentions raised by Connecticut and found that LILCO's emissions under New York's proposal would not violate the Clean Air Act. EPA Technical Support Document, supra, Memorandum, "Review of Comments Received on New York State Supplemental Air Quality Modeling Analysis of the Long Island Lighting Company," from Robert Predale to Raymond Werner, J.A. at 214. Accordingly, the EPA, on September 24, 1981, issued a final rule approving LILCO's special limitation which expires on Sept. 24, 1984. 46 Fed.Reg. 47,069 (1981).[16]
 
 
 14
 On November 12, 1981, the State of Connecticut petitioned this Court for review of the Agency's action pursuant to 42 U.S.C. Sec. 7607(b)(1) (Supp. IV 1980). Connecticut Fund for the Environment filed its petition 11 days later.[17] Both petitions raise various challenges to the propriety of the EPA's decision, many of which were presented by Connecticut in its comments submitted to the EPA. We now turn to these challenges.
 
 II
 
 15
 The many claims raised by the State of Connecticut and Connecticut Fund for the Environment encompass a maze of technical information and mathematical analysis. Petitioners question, among other things, both the statistical modeling used by the EPA in assessing the impact of LILCO's emissions upon Connecticut's air and the data used in performing these calculations. They claim the Agency used readings from an improper location, chose meteorological information from the wrong year and measured emission levels without considering the actual height of the stacks of LILCO's plants. Each of these charges must be examined in detail.
 
 
 16
 Two initial points of reference serve to guide us through our task of carefully evaluating the points of contention. As always, we begin with the language of the statute. Each challenge to the EPA's ruling hinges on 42 U.S.C. Sec. 7410(a)(2)(E) (Supp. IV 1980) which prohibits the EPA from approving a revision to a state implementation plan unless
 
 
 17
 ... it contains adequate provisions (i) prohibiting any stationary source [here LILCO's plants] within the State from emitting any air pollutant in amounts which will (I) prevent attainment or maintenance by any other State of any such national primary or secondary ambient air quality standard, or (II) interfere with measures required to be included in the applicable implementation plan for any other State under Part C of this subchapter to prevent significant deterioration of air quality or to protect visibility and (ii) insuring compliance with the requirements of section 7426 of this title relating to interstate pollution abatement.[18]
 
 
 18
 Petitioners allege here that the EPA, in approving New York's revision of its state implementation plan, violated every portion of this statutory provision. The statute therefore provides the basic framework for our analysis.
 
 
 19
 Our second focal point is provided by the statutory and time-tested principles which govern our standard of review. Courts inquiring into the propriety of agency action are to determine only whether that action is arbitrary and capricious, constitutes an abuse of agency discretion or is otherwise not in accordance with law. 5 U.S.C. Sec. 706(2)(A) (1976); 42 U.S.C. Sec. 7607(d)(9) (Supp. IV 1980); Friends of the Earth v. EPA, 499 F.2d 1118, 1123 (2d Cir.1974). The court must consider whether the agency's decision was based on a consideration of relevant factors and whether there is a clear error in judgment. "Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." Friends of the Earth v. EPA, supra, 499 F.2d at 1123, quoting Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).
 
 
 20
 Moreover, we are to give great deference to the Administrator's interpretation of the statutes she is charged with administering. EPA v. National Crushed Stone Association, 449 U.S. 64, 83, 101 S.Ct. 295, 306, 66 L.Ed.2d 268 (1980). Such deference is entirely appropriate in light of the Agency's expertise and experience with the intricate workings of the Clean Air Act and EPA's greater understanding of the pollution problem that Act is designed to control. Indeed, our willingness to uphold the EPA's construction, absent clear indication of a contrary legislative intent, is more than just an oft-repeated shibboleth. Allowing the Administrator broad discretion to carry out the will of the people, as expressed by Congress, is basic to this nation's historic commitment to the separation of powers. Our task is not to determine whether the Agency has selected the best means to that end, but only to ensure that the end is kept clearly in sight. As Justice Frankfurter so eloquently stated, the courts "must guard against the danger of sliding unconsciously from the narrow confines of law into the more spacious domain of policy." Phelps Dodge Corp. v. National Labor Relations Board, 313 U.S. 177, 194, 61 S.Ct. 845, 852, 85 L.Ed. 1271 (1941).
 
 
 21
 Accordingly, unless petitioners can demonstrate that the EPA's construction of 42 U.S.C. Sec. 7410(a)(2)(E) is plainly unreasonable, we must uphold that interpretation. See Lead Industries Association v. EPA, 647 F.2d 1130, 1147 (D.C.Cir.), cert. denied, 449 U.S. 1042, 101 S.Ct. 621, 66 L.Ed.2d 503 (1980). With these considerations in mind we turn to the specific provisions of the statute--provisions, we might add, whose myriad complexity reminds us of Learned Hand's description of the Internal Revenue Code. The words of that act, he declared "tend to dance before [one's] eyes in a meaningless procession: cross-reference to cross-reference, exception upon exception--couched in abstract terms that offer no handle to seize hold of--leav[ing] only a confused sense of some vitally important, but successfully concealed purport ...." Hand, Thomas Walter Swan, in The Spirit of Liberty 213 (I. Dilliard ed. 1952).
 
 
 22
 * 42 U.S.C. Sec. 7410(a)(2)(E)(i)(I) (Supp. IV 1980)[19] prohibits the EPA from approving a revision of a state implementation plan unless the plan as revised contains provisions which ensure that no fuel burning source will "prevent attainment or maintenance of any ... national primary or secondary ambient air quality standard in any other state." Nowhere, however, does the statute define the word "prevent." Such a definition is required for two distinct situations. When the affected state has attained the national ambient air quality standards ("NAAQSs") for a pollutant, it must be determined when pollution generated in another state will "prevent the maintenance" of that standard. And, when the affected state has not attained a standard, we must decide under what circumstances interstate pollution will "prevent the attainment" of that standard. Both situations are relevant here. Connecticut and CFE allege that LILCO's continued burning of 2.8% sulfur fuel will "prevent the attainment and maintenance" of the NAAQSs in Connecticut for both sulfur dioxide and total suspended particulates. Connecticut has attained the NAAQSs for sulfur dioxide. 40 C.F.R. Sec. 81.307 (1981). It has not attained the secondary standard for total suspended particulates. 40 C.F.R. Sec. 81.307 (1981)[20]
 
 1. SULFUR DIOXIDE
 
 23
 A literal reading of the word "prevent" in Sec. 7410(a)(2)(E)(i)(I) would require the EPA to approve New York's proposed revision unless petitioners could show that LILCO's emissions would make it impossible for Connecticut to maintain the standards for sulfur dioxide even by imposing stricter control measures upon its own pollution sources. The EPA properly rejected this literal interpretation of the statute.
 
 
 24
 The legislative history makes clear that the Clean Air Acts Amendments of 1977 were designed to ensure that one state would not be able to foist its pollution on another state and accordingly require that state to tighten its regulations to keep its air clean. See H.R.Rep. No. 294, 95th Cong., 1st Sess. 329-331, reprinted in 1977 U.S.Code Cong.Ad.News 1077, 1408-1410; S.Rep. No. 127, 95th Cong., 1st Sess. 41-42 (1977). Indeed, the 1977 Amendments replaced the earlier provisions of the Clean Air Act of 1970 which only required each state's implementation plan to provide measures for "intergovernmental cooperation." Congress determined that the earlier statute had proved ineffective in solving the difficult problem of interstate air pollution. S.Rep. No. 127, 95th Cong., 1st Sess. 41-42 (1977). It would be inconsistent with congressional purpose, therefore, for EPA to allow a state to increase its emissions if those emissions would cause a violation of the NAAQSs in another state. Accordingly, EPA concluded that regardless of what further regulations Connecticut might adopt, New York's proposed revision could be approved only if it would not cause a violation of the primary or secondary standards for sulfur dioxide in Connecticut given Connecticut's then prevailing emission limitations on its own sources of pollution. We accept this conclusion as reasonable and consistent with the purposes of the Clean Air Act. See Connecticut Fund for the Environment v. EPA, 672 F.2d 998, 1006 (2d Cir.1982).
 
 
 25
 Petitioners would apparently have us go farther and interpret Sec. 7410(a)(2)(E)(i)(I) as requiring the EPA to disapprove New York's proposed revision even if no violation of the standards would result from LILCO's emissions. They ask us to read the words "prevent the maintenance of any ... national ambient air quality standard" to mean "have a substantial impact on pollution" in the affected state. We decline to do so. Initially, we have every reason to believe that Congress meant what it said. Absent strong indications to the contrary, the plain language of a statute is the best index of its meaning. Manchester Environmental Coalition v. EPA, 612 F.2d 56, 60 (2d Cir.1979). Moreover, the question of one state's "substantial impact" on air pollution in another state is covered by other sections of the Clean Air Act. Part C of the Clean Air Act, one of the major additions of the 1977 Amendments,[21] is aimed at preventing the significant deterioration of air quality in areas which have attained the national ambient air quality standards. The Agency correctly points out that Sec. 7410(a)(2)(E)(i)(II) incorporates the provisions of Part C into this section of the statute, designed to achieve interstate pollution abatement. It is therefore entirely reasonable to assume that Congress intended the incorporation of Part C to ensure that pollution from one state would not unfairly contribute to pollution in another state. Accordingly, the EPA reasonably concluded that Sec. 7410(a)(2)(E)(i)(I) was not intended to do more than prohibit the Agency from approving state implementation plan revisions which will cause violations of the NAAQSs in nearby states. The Agency's construction must be upheld where reasonable. Train v. Natural Resources Defense Council, 421 U.S. 60, 75, 95 S.Ct. 1470, 1479, 43 L.Ed.2d 731 (1975).
 
 
 26
 Even accepting the EPA's construction, petitioners argue the Agency abused its discretion by concluding that New York's proposed revision would not cause a violation of the NAAQSs for sulfur dioxide in Connecticut.[22] The State of Connecticut and CFE claim the Agency used an improper modeling technique to estimate the effects of LILCO's emissions on Connecticut's air. They further assert that the EPA arbitrarily and capriciously used data obtained at LaGuardia Airport rather than weather readings taken from the closer Bridgeport Airport. Additionally, petitioners contend the Agency abused its discretion by using meteorological data from 1964, by failing to measure the effect of the tall height of LILCO's emissions stacks, and by refusing to take into account a proposed revision in Connecticut's SIP raising from .5% to 1% the permissible percentage of sulfur in fuel burned by pollution sources in Connecticut. See Connecticut Fund II. We note initially that EPA carefully considered each of the many technical points raised before approving LILCO's special limitation. Moreover, we stress that while "expertness is not a magic wand which can be indiscriminately waved over the corpus of an agency's findings to preserve them from review," L. Jaffe, Judicial Control of Administrative Action 613 (1965), this kind of technical decision is particularly within the realm of Agency expertise. See Mision Industrial Inc. v. EPA, 547 F.2d 123, 129 (1st Cir.1976). With these thoughts in mind, we begin our analysis of the petitioners' technical challenges.
 
 
 27
 a) Modeling
 
 
 28
 EPA based its conclusion that LILCO's continued emissions would not cause a violation of the NAAQSs for SO2 in Connecticut on analyses derived from the CRSTER model. Air quality models, like CRSTER, contain a set of mathematical equations used to calculate pollutant concentrations caused by a pollution source's emissions. Using actual data such as meteorological measurements and stack emission characteristics, the modeling analysis predicts concentrations for an array of points at various distances from the plant. The CRSTER, or single source, model estimates the impact on pollution concentration levels by measuring emission levels at a single source and calculating the likely effect of these emissions at various destinations using meteorological data such as wind velocity and direction. See Guideline on Air Quality Models (Office of Air Quality Planning and Standards 1.2-080, EPA, April 1978) incorporated by reference 40 C.F.R. Sec. 51.24(k) (1982), (hereinafter "Guideline on Air Quality Models" or "Guideline"); see generally Cleveland Electric Illuminating Company v. EPA, 572 F.2d 1150 (6th Cir.), cert. denied, 439 U.S. 910, 99 S.Ct. 279, 58 L.Ed.2d 256 (1978).
 
 
 29
 Petitioners challenge the EPA's use of the CRSTER model claiming that it is inadequate to measure the meteorological and terrain complexities created by the flow of air across Long Island Sound from New York to Connecticut.[23] One such problem raised by petitioners is the phenomenon of "fumigation." Fumigation occurs when the stream of air ("plume") carrying emissions from a pollution source comes into contact with a turbulent internal boundary layer of air ("TIBL") created by the temperature differential between warm air over coastal lands and cooler air carried in from the water. The TIBL erodes the plume causing the emissions to disperse over the land mass resulting in higher pollution concentrations at ground level.[24] The Agency itself, however, recognized these problems. In a letter from the EPA's Region II Administrator[25] to the Office of Air Quality Planning and Standards Clearinghouse in North Carolina, the Administrator requested an evaluation to determine the appropriate model to apply to the complexities created by the wind conditions over New York and Connecticut and by Connecticut's high terrain. EPA Technical Support Document, supra, J.A. 221-226. The Clearinghouse specifically concluded that the best approach would be to adjust the CRSTER model to account for the complicated terrain. EPA Technical Support Document, supra, J.A. at 228-229. It rejected the so-called "Valley Model" suggested by the State of Connecticut as well as other proposed alternatives.[26] Petitioners have failed to demonstrate that this carefully considered decision constituted an abuse of the Agency's discretion.
 
 
 30
 CFE alleges that the Agency contravened its own Guideline on Air Quality Models when it decided to rely on the CRSTER model. Petitioner simply misconstrues this Guideline. The Guideline does recommend the CRSTER model for situations where there are no significant meteorological or terrain complexities. Guideline on Air Quality Models Sec. 4.3.1 at 20, J.A. at 241. It further suggests that where such complexities exist, a model more suitable than the CRSTER model should be applied. Its conclusion, however, is that "each complex situation be treated on a case by case basis with the assistance of expert advice " (emphasis added). Id. The Guideline further states that "even though specific recommendations are made they should not be considered rigid requirements. The preferred model is that which best simulates atmospheric transport and dispersion in the area of interest." Guideline Sec. 1.0 at 1-2, CFE's Appendix at 1-2.
 
 
 31
 The EPA adopted exactly this case-by-case approach. It adjusted the CRSTER model to account for the terrain complexities in Connecticut and provided a detailed technical rationale for the inadequacy of other proposed models. Specifically, the Agency rejected the use of the Valley Model because it remains untested for distances as great as those which the LILCO emissions travel to reach Connecticut. EPA Technical Support Document, supra, Memorandum, "Long Distance Terrain Impacts from Power Plants on Long Island--Model Clearinghouse Comments" from Joseph Tikvart to Raymond Werner, J.A. at 228. While CFE points to problems with the CRSTER model created by breezes blowing pollution toward Connecticut from the air over Long Island Sound, it offers nothing to indicate that another modeling approach would better account for the overall complex situation. Nor is there the slightest indication that the Agency's reliance on the CRSTER model was arbitrary and capricious. To reject the EPA's conclusion under these circumstances would be to substitute our judgment concerning mathematical modeling techniques for that of the Agency. See Cleveland Electric Illuminating Company v. EPA, supra, 572 F.2d at 1161. This we cannot do. Accordingly, we conclude that CFE's challenge to the Agency's modeling is without merit.
 
 
 32
 b) Meteorological Data
 
 
 33
 Petitioners raise two objections to the meteorological data chosen by the Agency in calculating the effect of LILCO's emissions on Connecticut. They assert that the EPA should have used weather readings from Bridgeport rather than those taken from LaGuardia Airport. They further contend the Agency improperly combined meteorological data from 1964 with figures from 1973-1976. Neither of these Agency actions constituted an abuse of discretion.
 
 
 34
 The EPA's decision to use data from LaGuardia Airport clearly resulted from a considered judgment based on technical factors. The Agency selected LaGuardia weather readings because that airport is located on the same side of Long Island Sound as the LILCO plants. Wind conditions at LaGuardia, therefore, more closely simulate those at Northport and Port Jefferson. Petitioners correctly point out that the Bridgeport Airport is approximately 10 miles closer to the LILCO plants than LaGuardia, and EPA readily admits that proximity is one factor to be considered in determining the appropriate meteorological data to be utilized. Guideline on Air Quality Models Sec. 5.2 at 31, CFE's Appendix at 3. The Agency concluded, however, that the similarity in wind direction was a more significant factor in identifying the proper data than the proximity of the source. It reached that conclusion because the prevailing wind direction at Bridgeport is precisely opposite that at LILCO's plants, thus seriously undermining the usefulness of Bridgeport data regardless of its proximity. EPA Technical Support Document, supra, "Review of Comments Received on New York State Supplemental Air Quality Modeling Analysis of the Long Island Lighting Company," J.A. 214. Indeed, given the arguments raised by petitioners themselves[27] concerning the importance of the meteorologically complex air patterns over Long Island Sound, the Agency's decision seems quite sound. In any event, there can be no doubt that this considered weighing of competing factors produced a decision which was rationally based, see Bowman Transportation, Inc. v. Arkansas Best Freight System, Inc., 419 U.S. 281, 290, 95 S.Ct. 438, 444, 42 L.Ed.2d 447 (1974), and well within the Agency's discretion. See Mision Industrial, Inc. v. EPA, supra, 547 F.2d at 129.
 
 
 35
 Similarly, the Agency's decision to employ 1964 data was neither arbitrary nor capricious. The EPA used data from 1964 because that information was readily available in a format which could be combined with readings from 1973-1976. These five years of data were then inserted into the Agency's modeling analysis. Petitioners claim that 1964 figures could not be used because the Agency is required to rely on data from five consecutive years. The Guideline on Air Quality Models, however, specifies only that five years of data should generally be used. There is no requirement that these years be consecutive. Guideline on Air Quality Models Sec. 5.2 at 31-32. Moreover, to attempt to gather information from 1972 or 1977 would have caused months of delay. Petitioners do not allege that the data from 1964 was in any way unrepresentative. Absent some indication that figures from 1972 or 1977 would have significantly changed the results of EPA's analysis, it can hardly be said that the Agency abused its discretion by relying on data which was more readily available. See Citizens Against Refinery's Effects v. EPA, 643 F.2d 178, 181 (4th Cir.1981). Accordingly, petitioners' challenges to the meteorological data used by the Agency are without merit.
 
 
 36
 c) Stack Height
 
 
 37
 Petitioners further challenge the Agency's assumptions concerning the height of two of LILCO's stacks.[28] EPA performed its calculations by estimating the height of these stacks at 486 feet rather than using the actual height of 600 feet. CFE correctly points out that the use of the smaller figure produced an inaccurately low prediction of LILCO's impact on Connecticut's air. Taller stacks tend to have a greater impact on pollution levels at more distant locations. LILCO's stacks, therefore, create more pollution in Connecticut because of that state's distance from the plants.
 
 
 38
 CFE fails to recognize, however, that the Agency also conducted a supplemental analysis to assess the differential between the predicted impact using the lower estimated figure and the actual stack height. EPA Technical Support Document, supra, Memorandum, "Sensitivity Analysis of LILCO's Impacts on Connecticut Based on GEP versus Actual Stack Height Modeling," from Robert Predale to Raymond Werner, J.A. at 230. The Agency also relied on an analysis submitted by New York's Department of Environmental Conservation which employed actual stack height precisely to calculate a "worst case" scenario. EPA Technical Support Document, supra, Memorandum, "Review of the New York State Air Quality Modeling Analysis of LILCO's Impact on Connecticut," from Robert Predale to Raymond Werner, J.A. at 209. Both these additional studies support the Agency's conclusion that LILCO's emissions would not cause violations of the national ambient air quality standards for sulfur dioxide in Connecticut.[29] Under these circumstances, we conclude that the Agency did not abuse its discretion by partially relying on analysis using estimated stack heights when approving LILCO's special limitation.
 
 
 39
 We note en passant, that the Agency may have erred in its initial reliance on estimated stack heights. The EPA argues these estimates were required by Sec. 7423(a). That statute demands that an "emission limitation required for control of any air pollutant under an applicable implementation plan ... shall not be affected in any manner by (1) so much of the stack height of any source as exceeds good engineering practice (as determined under regulations promulgated by the Administrator) or (2) any other dispersion technique."[30] To comply with this statute, the Agency claims it had no choice but to model LILCO's stacks built after 1970 at the estimated good engineering practice height of 486 feet. The legislative history of Sec. 7423, however, indicates that the Agency's application of that statute to this situation may run counter to congressional intent.
 
 
 40
 Section 7423, a part of the Clean Air Act Amendments of 1977, was based on congressional concern that prior statutes and regulations were undesirably encouraging the use of tall stacks.[31] See H.R.Rep. No. 294, 95th Cong., 1st Sess. 81-94, reprinted in 1977 U.S.Code Cong. & Ad.News at 1159-1172. Emissions from tall stacks inevitably travel further, often across state boundaries, increasing the problem of interstate pollution.[32] That problem was being exacerbated because industries were building taller stacks so as to more widely disperse their emissions and avoid violating local pollution regulations. Section 7423, therefore, was designed to prevent industries from receiving "credit" toward the required amounts of emission reductions for their tall stacks. H.R.Conf.Rep. No. 564, 95th Cong., 1st Sess. 143-44, reprinted in 1977 U.S.Code Cong. & Ad.News 1502, 1524. In this case, however, the "credit" runs in the other direction.
 
 
 41
 Because petitioners challenge the interstate impact of LILCO's special limitation, the use of the lower good engineering practice stack height provides results more favorable to LILCO than does the analysis using actual stack height. The Agency's reading of the statute, therefore, seems to create precisely the result Congress intended to avoid. It gives "credit" to LILCO for building a taller stack. We would be reluctant to approve this interpretation in the absence of some indication that Congress meant to allow Sec. 7423 to encourage the use of tall stacks. In any event, because the Agency's decision did not rest exclusively on modeling performed with good engineering practice stack height, we need not resolve the question of the precise meaning of Sec. 7423 concerning interstate effects. Accordingly, we hold only that the Agency did not abuse its discretion by relying initially on studies employing good engineering practice stack height since it also considered additional evaluations using the actual height of LILCO's stacks.
 
 
 42
 d) Connecticut's Proposed Revision
 
 
 43
 CFE argues that the Agency abused its discretion by failing to take into account a proposed revision in Connecticut's state implementation plan which would raise the permissible percentage of sulfur in fuel burned in that state from .5% to 1%. EPA proposed that revision for approval, 46 Fed.Reg. 45,738 (Sept. 11, 1981), two weeks before it finally approved LILCO's special limitation, 46 Fed.Reg. 47,096 (Sept. 24, 1981).[33] The short answer to CFE's contention is that no provision in the Clean Air Act requires the EPA to consider the impact of a proposed revision of one state's implementation plan upon a restructuring of the state implementation plan of another state. We do not mean to imply, however, that a situation could never arise where the general scheme of the Clean Air Act[34] would require the Agency to consider the combined effect of two proposed revisions before approving either.
 
 
 44
 In this case, the Agency did consider the combined effect of both revisions on Connecticut's air before permitting Connecticut to revise its SIP. In our holding in Connecticut Fund II, we conclude today that the EPA acted within its discretion when it determined that the combined effects of LILCO's emissions and increased pollution created by the burning of 1% sulfur fuel in Connecticut would cause no violations of the NAAQSs in Connecticut. Accordingly, the Agency's failure to consider Connecticut's revision before approving LILCO's special limitation was at worst harmless error. We hold, therefore, that EPA did not violate Sec. 7410(a)(2)(E) when it concluded that New York's proposed revision of its SIP which allowed LILCO to continue burning 2.8% sulfur fuel at Port Jefferson units 3 and 4 and Northport units 1-3 would not "prevent the maintenance" of the national ambient air quality standards for sulfur dioxide in Connecticut.
 
 2. Total Suspended Particulates
 
 45
 The burning of high sulfur fuel at LILCO's Northport and Port Jefferson Plants affects Connecticut's level of total suspended particulates in two ways. The greater sulfur content in the fuel increases the particulate emissions directly pouring out of LILCO's stacks. In addition, sulfur released into the air will under certain atmospheric conditions combine with other airborne molecules to create particulates known as sulfates.[35] Petitioners allege that each of these effects will impermissibly contribute to the already existing violations of the NAAQSs for TSP in Connecticut. More specifically, they claim that EPA violated Sec. 7410(a)(2)(E)(i)(I) when it approved LILCO's special limitation because New York's SIP, petitioners allege, no longer prohibits LILCO from emitting any air pollutant which will "prevent the attainment" of the NAAQSs for TSP in Connecticut.
 
 
 46
 EPA claims it need not consider the impact of New York's proposed revision on TSP levels in Connecticut. The Agency argues that because limitations on the sulfur content in fuel are part of New York's state implementation plan to control sulfur dioxide, any changes in sulfur regulations require the Agency to examine only the effect on SO2 levels. In our companion case, Connecticut Fund II, we hold today that where the EPA is considering the effect of a proposed revision of a SIP on pollution levels within one state, it may, within the reasonable exercise of its discretion, permit that state to regulate on a pollutant by pollutant basis. Although mindful of the deference to be given to the Agency's interpretation of the statute, we feel we must exercise the utmost caution before extending that ruling to apply to situations like the one presented here where the revision of New York's SIP affects concentration levels of pollutants in another state, namely Connecticut. Indeed the language of the Clean Air Act points toward the opposite conclusion.
 
 
 47
 Section 7410(a)(1) requires each state to adopt and submit to the EPA a state implementation plan for each national ambient air quality standard within nine months of the promulgation of such standard. Section 7410(a)(2)(B), a provision involved in our companion case, Connecticut Fund II, prohibits the Agency from approving a revision of a state implementation plan unless it contains measures necessary to insure the attainment and maintenance of "such standard" (emphasis added). By contrast, Sec. 7410(a)(2)(E)(i)(I) dealing with interstate impacts, forbids EPA approval of a revision of a SIP unless
 
 
 48
 it contains adequate provisions prohibiting any stationary source [here LILCO's plants] within the state from emitting any air pollutant in amounts which will prevent attainment or maintenance by any other state of any such national ambient air quality standard. (emphasis added)
 
 
 49
 Congress's purpose in enacting Sec. 7410(a)(2)(E) indicates that this difference in language was probably not a product of inadvertent drafting.
 
 
 50
 One central focus of the Clean Air Act Amendments of 1977 was to ensure that the EPA would monitor and control the impact of pollution from one state on air quality in another. H.R. No. 294, 95th Cong., 1st Sess. 329-331, reprinted in 1977 U.S.Code Cong. & Ad.News at 1408-10; S.Rep. No. 127, 95th Cong., 1st Sess. 41-42 (1977). See also State of Connecticut v. EPA, 656 F.2d 902 (2d Cir.1981). Unlike the intrastate effects in Connecticut Fund II, which resulted only after Connecticut had the opportunity to choose for itself between different approaches to controlling SO2 and particulates, here LILCO's emissions, were they to significantly contribute to Connecticut's TSP concentrations, would deprive Connecticut of that flexibility. Allowing one state to foreclose another from exercising the many options available for controlling its pollution problem seems contrary to the congressional intent of strengthening each state's protection against interstate pollution.[36] The use of the word "any" in Sec. 7410(a)(2)(E), therefore, seems precisely tailored to require the EPA to consider the effect of a revision of one state's implementation plan upon all NAAQSs in other states. Moreover, the Agency presents no evidence that Congress did not intend these words as written. Accordingly, we have serious difficulty with the EPA's contention that New York is free to revise its SIP for SO2 without any federal consideration of whether the revision will "prevent the attainment" of the NAAQSs for TSP in Connecticut.
 
 
 51
 We need not uphold the Agency's argument, however, to conclude that no violation of the Clean Air Act occurred, concerning total suspended particulates, when the EPA approved LILCO's special limitation. The Agency did, in fact, consider the effect of LILCO's emissions on TSP concentrations in Connecticut, at least to the extent these effects could be measured. The Agency decided that the burning of 2.8% sulfur fuel at Northport and Port Jefferson created an insignificant impact on TSP levels in Connecticut. For the reasons discussed below, we find that the Agency acted well within its discretion in reaching that conclusion.
 
 
 52
 a) Direct Emissions
 
 
 53
 The EPA's analysis of LILCO's direct particulate emissions revealed their impact on TSP levels in Connecticut would be minimal. The maximum estimated impact was 0.10 ug/m[3] on an annual basis and 2.06 ug/m[3] on a 24-hour basis. EPA Technical Support Document, supra, Attachment A, J.A. at 233. This compares to primary NAAQSs of an annual geometric mean concentration of 75 ug/m[3] and an average 24-hour second-high concentration of 260 ug/m[3]. (the secondary NAAQS is an average second high 24-hour concentration of 150 ug/m[3]) 40 C.F.R. Secs. 50.6-50.7 (1982). These low-level impacts are not unexpected. LILCO's stacks are equipped with electrostatic precipitators designed to trap virtually all particulates before they are released. Moreover, LILCO's plants must comply with New York's particulate regulations, which are in fact more stringent than Connecticut's.[37] Although CFE challenges the modeling EPA used to obtain its results, we have previously explained that the Agency acted well within its discretion in rejecting petitioners' reliance on the so-called "Valley Model". Accordingly, we accept the EPA's estimates concerning the direct effect of LILCO's particulate emissions on Connecticut.
 
 
 54
 In addition, we agree with EPA that these minimal impacts will not "prevent [Connecticut's] attainment" of the NAAQSs for TSP in contravention of Sec. 7410(a)(2)(E)(i)(I). The legislative history is again unclear as to the precise meaning of "prevent the attainment" in situations where the affected state has not yet complied with the NAAQSs. See H.R.Conf.Rep. No. 564, 95th Cong., 1st Sess. 145-46, reprinted in 1977 U.S.Code Cong. & Ad.News at 1526-27; H.R.Rep. No. 294, 95th Cong., 1st Sess. 329-31, reprinted in 1977 U.S.Code Cong. & Ad.News at 1408-10. The Agency suggests that the words of the statute indicate a congressional desire to prohibit revisions to state implementation plans which will "significantly contribute" to already existing violations in other states. The problem with this interpretation, however, is that the statute contains no guidelines as to what would constitute a "significant contribution." Moreover, the 1977 Clean Air Act Amendments unmistakably indicate a strong congressional policy to strengthen the procedure for bringing each state to compliance with the national standards. See H.R.Rep. No. 294, 95th Cong., 1st Sess. 1, reprinted in 1977 U.S.Code Cong. & Ad.News at 1079; see also National Resources Defense Council v. Gorsuch, 685 F.2d 718 (D.C.Cir.1982).[38] We must tread lightly, therefore, in approving any interpretation of the Clean Air Act which might interfere with the statutory goal of ensuring that each state comply with the NAAQSs as "expeditiously as practicable". See Sec. 7502.
 
 
 55
 On the other hand, nothing in the legislative history indicates that Sec. 7410(a)(2)(E)(i)(I) was intended to prevent even minimal impacts upon another state's pollution concentrations simply because that state has not attained the national standards.[39] To adopt this approach would be to hold one state hostage to another's failure to enact the pollution control strategies necessary to conform to the requirements of the Clean Air Act. Moreover, as intervenor LILCO points out, the language of Sec. 7410(a)(2)(E)(i)(I) seems to contemplate a standard which would prohibit SIP revisions only if the emissions they permit would in and of themselves prevent a nearby state from attaining the NAAQSs. Accordingly, we cannot reject the Agency's interpretation of the statute in favor of a blanket rule forbidding the EPA from approving any SIP revision which permits additional amounts of a specific pollutant to be added to concentrations in a nearby state which has not attained the NAAQSs.
 
 
 56
 At the same time, the facts of this case do not require us to conclusively adopt the Agency's suggestion that Sec. 7410(a)(2)(E)(i)(I) prohibits only those SIP revisions which will "significantly contribute" to pollution concentrations in the affected state. We hold only that where the impact upon a nearby state of another state's revision of its SIP is shown by the Agency to be so insignificant as to be fairly described as minimal, the EPA may approve that revision even where the affected state is not in compliance with the NAAQSs. See Alabama Power Co. v. Costle, 636 F.2d 323, 360-61 (D.C.Cir.1979). Here the estimated maximum impact of 2.06 ug/m[3] is less than 1.5% of even the secondary NAAQS. Because this impact is truly minimal, we conclude that the EPA did not violate Sec. 7410(a)(2)(E)(i)(I) when it determined that LILCO's direct particulate emissions would not "prevent the attainment" of the NAAQSs for TSP in Connecticut.
 
 
 57
 b)Sulfate Formation
 
 
 58
 Connecticut and CFE vigorously contend that even if the direct particulate emissions from LILCO's plants will not prevent the attainment of the NAAQSs for TSP in Connecticut, the indirect formation of sulfates will. The possibility does exist that higher sulfur emissions will react with other elements in the atmosphere to create dangerous particulates called sulfates.[40] The short answer to petitioners' contention, however, is that the EPA, as yet, has no adequate model to predict the likelihood of that possibility. See Guideline on Air Quality Models (1978). Because of the severe health dangers associated with high concentrations of suspended sulfates,[41] we can reasonably expect that the Agency will continue to strive towards developing techniques capable of measuring the degree of risk posed by sulfate formation. A time may come, therefore, when the Agency will establish NAAQSs for sulfates and when all SIP revisions will be evaluated for their likely impact on sulfate levels. Alternatively, the Agency may take so long to address, or at least measure, the sulfate problem that any further delay could be found to be an abuse of discretion. Until that time, however, it can hardly be said that the Agency's failure to consider an effect it cannot measure constitutes a violation of the Clean Air Act. See Mision Industrial, Inc. v. EPA, supra, 547 F.2d at 131.
 
 
 59
 Connecticut and CFE argue that the Agency's inability to measure sulfate formation is insufficient to justify its refusal to at least approximate likely sulfate impacts. Two additional technical factors, however, support EPA's unwillingness to guess at the indirect impact of LILCO's emissions on Connecticut. Initially, the Agency was aware that during the winter periods when sulfate levels in Connecticut posed the greater threat, the wind direction was least likely to blow LILCO's emissions toward Connecticut.[42] In addition, the Connecticut Department of Environmental Protection measured sulfate levels in Connecticut and found them to be relatively homogeneous thus indicating that sulfates in Connecticut's atmosphere probably travelled from points farther away than LILCO's plants.[43] Particularly when faced with these two indications that sulfate levels in Connecticut were not a product of LILCO's emissions, the EPA reasonably concluded that it need not consider the possibility of sulfate formation which the Agency itself could not satisfactorily measure. See Mision Industrial Inc. v. EPA, supra, 547 F.2d at 131. Accordingly, the Agency did not violate Sec. 7410(a)(2)(E)(i)(I) when it made no specific estimate of the impact of LILCO's emissions on sulfate formation in Connecticut.
 
 
 60
 Our analysis of each of petitioners' challenges, therefore, reveals that the Agency did not abuse its discretion by concluding that LILCO's burning of 2.8% fuel at Northport and Port Jefferson will not prevent the attainment or maintenance of the NAAQSs in Connecticut.
 
 B
 
 61
 The State of Connecticut also claims that EPA violated Sec. 7410(a)(2)(E)(i)(II) when it approved New York's grant of LILCO's special limitation. This section of the statute forbids the Agency from approving a revision of a SIP unless the plan as revised contains adequate provisions prohibiting emissions which will "interfere with measures required to be included in the applicable implementation plan for any other state under Part C ... to prevent significant deterioration of air quality." Part C,[44] added to the Clean Air Act by the 1977 Amendments, establishes an elaborate scheme requiring states to safeguard the air quality of areas where the NAAQSs have already been attained[45]. Because Connecticut has not attained the secondary NAAQS for total suspended particulates,[46] Part C does not apply to that pollutant. Connecticut's challenge pursuant to Part C, therefore, is based only on increased concentrations of sulfur dioxide.
 
 
 62
 Certain aspects of Part C are particularly relevant for our purposes.[47] Section 7473 enumerates maximum incremental increases of specific pollutants which may be added to atmospheric concentrations above the statutorily designated "baseline concentration." Each state is required to include in its SIP "measures to assure" that these maximum increases (or "PSD increments") are not exceeded. Id. Sec. 7473(a). For example, the PSD increment for 24-hour concentrations of SO2 is 91 ug/m[3] in Connecticut.[48] Once a baseline concentration is fixed, Connecticut may not permit increases in the 24-hour second highest concentrations of SO2 which surpass that amount.
 
 
 63
 Baseline concentration levels for each pollutant are defined as "the ambient concentration levels which exist at the time of the first application for a permit [pursuant to the permit program set forth in Sec. 7475]". Sec. 7479(4). Because of Connecticut's problems in achieving the NAAQSs for TSP, no major pollution sources have applied for construction permits, and accordingly no baseline for SO2 has yet been established. Indeed, Connecticut's failure to develop a satisfactory plan aimed at bringing Connecticut into compliance with the TSP standards has resulted in a statutorily imposed moratorium on the construction of major pollution sources in the state. Sec. 7502(a)(1); Sec. 7410(a)(2)(I); see generally, Connecticut Fund for the Environment v. EPA, supra, 672 F.2d 998.
 
 
 64
 The Agency uses the absence of a baseline in Connecticut to make the following argument. First, the EPA points out, Sec. 7473 requires only that each state's implementation plan contain measures to ensure that PSD increments above the baseline will not be exceeded. The Agency further relies on the language of Sec. 7410(a)(2)(E)(i)(II) which prohibits the EPA from approving LILCO's special limitation only if the emissions from Port Jefferson and Northport will "interfere with the measures required by [Sec. 7473 and the other provisions of Part C]". Combining these two sections of the statute, the EPA reasons that since no baseline has yet been established, Sec. 7473 places no requirements upon Connecticut. Therefore, the Agency concludes, there are no measures with which New York's proposed revision could interfere.
 
 
 65
 Although in Connecticut Fund III we accept the argument that Sec. 7410(a)(2)(J) requires that Connecticut's SIP provide for PSD only when and where a baseline has been established, in this case the Agency's argument may prove too much. Taken to its extreme, the Agency's position would read Sec. 7410(a)(2)(E)(i)(II) completely out of the statute whenever the affected state, for whatever reason, has failed to establish a baseline. Such an interpretation is difficult to reconcile with Congress's obvious purpose of including provisions to prevent the significant deterioration of air quality in its over-all scheme to combat interstate pollution.[49] Moreover, we need not accept the Agency's rationale to conclude, as we do, that the EPA did not abuse its discretion in approving LILCO's special limitation.
 
 
 66
 Two specific and related dangers are inherent in the EPA's approach. Some states that lack a baseline and that therefore are not yet subject to the requirements of Part C may nevertheless have taken voluntary measures tailored to allow the state to comply with the statute over the long run. These measures might be defeated by excessive interstate pollution. More important, a situation could arise where, because of the absence of a baseline in one state, a nearby state could continue to export pollution until the affected state's concentrations of a specific pollutant reached the NAAQSs. Thereafter, if a baseline were set, the affected state would be unable to permit additional pollution within its own PSD increment because any further additions to SO2 concentrations would violate the NAAQSs. The PSD increment in effect would have been consumed by the nearby state. Accordingly, a blanket rule which allows unlimited interstate pollution before the affected state has established a baseline might in some instances interfere with measures the affected state will later be required to enact pursuant to Part C.
 
 
 67
 Alabama Power Co. v. Costle, supra, 636 F.2d 323 ("Alabama Power") does not resolve these difficult issues concerning interstate pollution. We agree with EPA that Alabama Power, id. at 374-376, conclusively establishes that no baseline will exist in Connecticut until the first permit application is filed. See Connecticut Fund III. Accordingly, the State of Connecticut has not taken any direct measures pursuant to Sec. 7473 to ensure that additional pollution concentrations will not exceed the baseline by amounts greater than the PSD increments. The Court in Alabama Power, however, did not hold that a state could not choose to take measures pursuant to Part C before a baseline is established. Moreover, the Court acknowledged that "[Sec. 7410(a)(2)(E)(i) ] provides a vehicle for implementing the congressional objective of abating substantial interstate air pollution" beyond the narrower requirements of the permit process of Part C. 636 F.2d at 366. Neither Alabama Power nor the facts of this case require us to embrace the EPA's extreme position that it must allow New York to add to the SO2 in Connecticut's air until a baseline is established in Connecticut. We therefore decline to resolve the overall relationship between Part C and the provisions of the Clean Air Act concerning interstate pollution.
 
 
 68
 In the present case, Connecticut points to no specific measures it has taken to control sulfur dioxide levels with which LILCO's emissions will interfere. In addition, there is no evidence that the impact of LILCO's emissions will bring concentrations of SO2 in Connecticut so close to the NAAQSs as to preclude Connecticut from taking advantage of its PSD increment. Indeed, we note that Connecticut has already taken steps to permit additional sulfur burning under its Energy Trade Program. See Connecticut Fund III. Neither of the dangers to which we allude above, therefore, is at issue here. Accordingly, we hold that under these specific circumstances the Agency complied with Sec. 7410(a)(2)(E)(i)(II) when it concluded that LILCO's emissions would not "interfere with [Connecticut's] measures required by Part C" of the Clean Air Act.
 
 C
 
 69
 Petitioners' additional claims are without merit and may be disposed of briefly. CFE asserts the EPA abused its discretion when it approved LILCO's special limitation without responding to Connecticut's petition filed pursuant to Sec. 7426. Section 7426(b)[50] does require EPA to make a finding concerning the interstate effects of a proposed revision of a SIP within 60 days of the filing of a petition, and the Agency has presented no excuse for its failure to do so in this case. While we cannot condone the EPA's disregard of this procedural mechanism established by Congress, the Agency's inaction provides no basis for overturning its decision to approve New York's proposed revision of its SIP. EPA's decision was made after full consideration of the effect of LILCO's emissions on Connecticut. A finding that LILCO's impact on Connecticut will not violate the requirements of the Clean Air Act is implicit in the Agency's action. Moreover, this court has specifically held that the language of Sec. 7410(a)(2)(E)(ii) requiring revisions of SIPs to contain provisions "insuring compliance with Sec. 7426" does not necessitate an Agency finding in response to a Sec. 7426 petition prior to final approval of a proposed SIP revision. State of Connecticut v. EPA, supra, 656 F.2d at 907.[51] Accordingly, we cannot accept CFE's claim that the Agency's failure to make a specific finding in response to Connecticut's Sec. 7426 petition warrants a decision by this court overturning the Agency's approval of LILCO's special limitation.
 
 
 70
 Connecticut argues that the Agency is not only required to consider the effect of LILCO's emissions but also to examine the cumulative impact of all New York pollution sources upon Connecticut's air. This court has previously rejected that argument. Id. at 909. For purposes of a revision application "the proper inquiry is directed to the emission of a particular source of pollution." Id. at 909 (quoting Ohio Environmental Council v. EPA, 593 F.2d 24, 30 (6th Cir.1979). The EPA, therefore, was not required to consider the cumulative impact of all New York sources on Connecticut when approving a special limitation for LILCO alone.
 
 
 71
 Finally, Connecticut contends that the EPA should not be permitted to grant LILCO's special limitation for a full three years. Petitioner argues that because LILCO benefitted from the illegal burning of 2.8% sulfur content fuel between May 31, 1980, when its previous limitation expired, and Sept. 24, 1981, the date of EPA's final ruling challenged here, the Agency must subtract this approximately 16 month period from the three year duration of LILCO's special limitation. While we share petitioner's concern over LILCO's violation of the law, nothing in the Clean Air Act supports Connecticut's contention that the Agency is forbidden to extend LILCO's special limitation for three years from the date of approval. Accordingly, the EPA did not abuse its discretion by refusing to make the effective date of LILCO's special limitation retroactive to the time when its previous limitation expired.
 
 III
 
 72
 We close by emphasizing the narrowness of our holding. It is not our task to commend or even condone the Agency's action. Rather, we decide only that under the particular circumstances presented to us, the EPA did not abuse its discretion or violate the Clean Air Act when it approved the challenged revision of New York's state implementation plan. In arriving at that decision, we have necessarily engaged in an attempt to clarify certain provisions of the Act. Further cases will yield additional clarification. It is naive, however, to seek absolute certainty when dealing with matters as complex as the measures enacted to improve the quality of the nation's environment. As Dean Bayless Manning has noted, even the constant "elaboration of legal propositions in a dedicated pursuit of virtue [cannot] exorcise the demon of ambiguity." What intense judicial scrutiny of administrative decisions can assure is that ambiguity will not become a smokescreen for abuse. Our conclusion that, in this case, the Agency remained within its mandate only buttresses our belief in the importance of the judicial process. Indeed, it reaffirms our commitment to the fundamental role of the courts as the interpreters of our nation's laws.
 
 
 73
 The petitions for review are denied.
 
 
 
 [1]
 The Clean Air Act is codified at 42 U.S.C. Secs. 7401-7642 (Supp. IV 1980)
 
 
 [2]
 Pub.L. No. 91-604, 84 Stat. 1676 (codified at 42 U.S.C. Secs. 1857-1858a (1970))
 
 
 [3]
 Current version at 42 U.S.C. Sec. 7409 (Supp. IV 1980)
 
 
 [4]
 Current version at 42 U.S.C. Sec. 7410 (Supp. IV 1980)
 
 
 [5]
 Current version at 42 U.S.C. Sec. 7410(a)(2)(A)-(K) and 42 U.S.C. Sec. 7410(a)(3)(A) (Supp. IV 1980)
 
 
 [6]
 Pub.L. No. 95-95, 91 Stat. 685
 
 
 [7]
 See generally H.R.Rep. No. 294, 95th Cong., 1st Sess. 329-331, reprinted in 1977 U.S.Code Cong. & Ad.News 1077, 1408-1410
 
 
 [8]
 See 42 U.S.C. Sec. 7410(a)(2)(E) quoted in detail infra, at 154
 
 
 [9]
 A "special limitation" might more appropriately be called a variance. It permits its owner to "vary" from the limits otherwise established on the contents of fuel. To remain consistent, we shall continue to use the statutory term
 
 
 [10]
 Connecticut Fund for the Environment v. EPA, 696 F.2d 179, ("Connecticut Fund II" ) and Connecticut Fund for the Environment v. EPA, 696 F.2d 179 ("Connecticut Fund III" ) were argued on Sept. 15, 1982 with the instant case. Our opinions in those cases are incorporated herein. Specific citations to them will henceforth be made using the abbreviated forms Connecticut Fund II and Connecticut Fund III
 
 
 [11]
 LILCO, of course, wishes to burn high sulfur fuel because it is less expensive. In 1979, for example, the utility saved approximately 52 million dollars by using the cheaper fuel
 
 
 [12]
 Staff Evaluation of Proposed Extension of Special Fuel Use Limitation for Long Island Lighting Company, Northport and Port Jefferson Facilities, Suffolk County, New York, New York Department of Environmental Conservation, January 14, 1980, at 9-10, Joint Appendix ("J.A.") at 27-28
 
 
 [13]
 These standards are set forth at 40 C.F.R. Secs. 50.4-50.7 (1982)
 
 
 [14]
 DEC Staff Evaluation, supra note 12, at 2, J.A. at 20
 
 
 [15]
 By their terms these rules govern original state implementation plans. They are made applicable to revisions by 42 U.S.C. Sec. 7410(a)(3)(A). See Train v. Natural Resources Defense Council, Inc., 421 U.S. 60, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975)
 
 
 [16]
 On April 15, 1981, Connecticut filed suit against LILCO, New York's Commissioner of Environmental Conservation, and the acting administrator of the EPA, in the United States District Court for the Eastern District of New York, pursuant to 42 U.S.C. Sec. 7604. Connecticut sought an injunction ordering LILCO to cease burning 2.8% fuel which the utility had continued to burn after its special limitation had expired on May 31, 1980. In a memorandum and order dated March 24, 1982, Judge Pratt granted summary judgment to the defendants and dismissed Connecticut's complaint as moot because of EPA's September 24, 1981 ruling extending LILCO's special limitation. Judge Pratt also denied Connecticut's claim for damages allegedly resulting from LILCO's emissions. State of Connecticut v. Long Island Lighting Company, 535 F.Supp. 546 (E.D.N.Y.1982)
 
 
 [17]
 The two cases were consolidated on December 18, 1981. LILCO's motions for leave to intervene were granted on December 16, 1981 and December 23, 1981
 
 
 [18]
 Where the Agency determines that the conditions set forth in 42 U.S.C. Sec. 7410(a)(2)(A)-(K) (Supp. IV 1980), including those quoted from 42 U.S.C. Sec. 7410(a)(2)(E), are met, it must approve the SIP revision. State of Connecticut v. EPA, 656 F.2d 902, 906 (2d Cir.1981); Union Electric Co. v. EPA, 427 U.S. 246, 257, 96 S.Ct. 2518, 2525, 49 L.Ed.2d 474 (1976). If any condition is not satisfied, the EPA must disapprove the proposed change of the state plan. See Train v. Natural Resources Defense Council, 421 U.S. 60, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975)
 
 
 [19]
 References to sections of the Clean Air Act, 42 U.S.C. Secs. 7401-7642 (Supp. IV 1980) will henceforth be made to section number only, e.g., 42 U.S.C. Sec. 7401 (Supp. IV 1980) will be cited Sec. 7401
 
 
 [20]
 At the time of EPA's final ruling, Waterbury and Greenwich, two cities in Connecticut, had also failed to attain the primary NAAQSs for TSP. 40 C.F.R. Sec. 81.307 (1981). They have since been redesignated by EPA as having complied with those standards. 47 Fed.Reg. 44,263 (1982) (to be codified at 40 C.F.R. Sec. 81.307)
 
 
 [21]
 Pub.L.No. 95-95, 91 Stat. 685; see discussion infra at 166-167
 
 
 [22]
 EPA originally concluded that the total impact from LILCO's plants (including background emissions) on Connecticut's air would be a second high three-hour concentration of 1082.1 ug/m[3], a second high 24-hour concentration of 283 ug/m[3], and an annual mean concentration of 47.3 ug/m[3]. EPA Technical Support Document, supra, Memorandum, "Renewal of SIP Revision: LILCO's Port Jefferson and Northport Power Plants," from Eric Chasanoff to Raymond Werner, J.A. at 203. These totals are well below the secondary NAAQS of 1300 ug/m[3] second high three-hour concentration and the primary standards of 365 ug/m[3] (24 hour) and 80 ug/m[3] (annual concentration). 40 C.F.R. Secs. 50.4-50.5 (1981). Supplemental analysis submitted by New York and approved by EPA indicated even smaller estimates of LILCO's likely impact on Connecticut's predicted 24-hour concentration of SO2 . EPA Technical Support Document, supra, Memorandum, "Review of the New York State Air Quality Modeling Analysis of LILCO's Impact on Connecticut, Submitted on April 16, 1981," from Robert Predale to Raymond Werner, J.A. at 209.
 Initially, Connecticut also claimed New York's proposed revision would cause violations of Connecticut's state standards for SO2 . These standards, however, have been repealed. 46 Fed.Reg. 56,614 (1981). Moreover, the Agency need not consider the impact of LILCO's emissions on Connecticut's efforts to maintain compliance with state standards. State of Connecticut v. EPA, 656 F.2d 902, 909 (2d Cir.1981).
 
 
 [23]
 LILCO's plants are located on the south shore of Long Island Sound. Emissions are blown across the sound into Connecticut which borders the north shore of that body of water
 
 
 [24]
 New York's original analysis of the likely impact of LILCO's continued burning of high sulfur fuel had specifically estimated the effects of fumigation and concluded that these effects would not produce a violation of the NAAQSs for SO2 in the vicinity of the plants. Staff Evaluation of Proposed Extension of Special Fuel Use Limitation for Long Island Lighting Company, supra, note 12 at 9, J.A. at 27. In addition, a 1977 study conducted by LILCO revealed that fumigation would have only a minor effect on the impact of the company's emissions on Connecticut. Impact of the Proposed Suffolk County Special Limitations on Connecticut, Long Island Lighting Company, May 23, 1977 at 9, J.A. at 160. These studies support the conclusion that the Agency acted within its discretion in ultimately using the CRSTER model, which is not designed to measure fumigation effects. Moreover, the Agency did adjust its calculations to consider the fact that high terrain in Connecticut affected the height differential between the top of LILCO's stacks and ground level. EPA Technical Support Document, supra, note 22, J.A. at 209
 
 
 [25]
 EPA Region II covers New Jersey, New York, Puerto Rico and the Virgin Islands. 40 C.F.R. Sec. 1.7(b)(2) (1981)
 
 
 [26]
 The so-called "Valley Model" is designed for situations where emissions arise from low (valley terrain) and impact with rugged terrain such as cliffs and bluffs. It relies on assumed meteorological conditions rather than actual data. EPA Technical Support Document, supra, J.A. at 222-23
 
 
 [27]
 See discussion supra at 157-158
 
 
 [28]
 The Agency modeled only stacks 3 and 4 at Northport using the lower figure. The other facilities were constructed prior to 1970 and EPA therefore employed actual stack height when calculating the impact of their emissions. See 42 U.S.C. Sec. 7423(a)(2) and discussion infra at 161
 
 
 [29]
 New York's study indicated that the second highest maximum 24-hour average impact on SO2 levels in Connecticut would be 87 ug/m[3]. When added to the effects from Connecticut sources, the total sulfur dioxide level would be 214 ug/m[3], well below the primary NAAQS of 365 ug/m[3]. Even when analyzed at locations where pollution from Connecticut sources was the greatest, LILCO's impact was still predicted to result in a second high maximum concentration of only 259.8 ug/m[3]. The EPA's supplemental analysis found somewhat greater impacts on Connecticut when LILCO's actual stack height was used. None of the predicted maximum 24-hour impacts, however, exceeded the NAAQS for SO2 .
 
 
 [30]
 Good engineering practice is defined for purposes of the statute as "the height necessary to insure that emissions from the stack do not result in excessive concentrations of any air pollutant in the immediate vicinity of the source." Sec. 7423(c). Recent EPA regulations have further refined this definition. 47 Fed.Reg. 5864 (1982)
 
 
 [31]
 In the words of Senator Muskie, "Far from prohibiting the construction of tall stacks or the use of intermittent controls, the [EPA 1976 Guidelines] provide that once minimal emission control requirements are met, polluters are encouraged to substitute unlimited stack height for any further control of emissions.... A policy of encouraging tall stacks will increase the burden of pollution. Long range transport of pollutants will be exacerbated. There is no support in the Clean Air Act for such a policy." 123 Cong.Rec. S9175 (daily ed. June 8, 1977); see generally Alabama Power Co. v. Costle, 636 F.2d 323, 388-94 (D.C.Cir.1979)
 
 
 [32]
 The House Report concerning the 1977 Clean Air Amendments indicates serious interstate dangers posed by tall stacks, among them the likely combination of sulfur dioxide with nitrogen dioxide into so-called "acid rain." Acid rain reduces soil productivity and harms vegetation, crops, buildings and other matter. See H.R.Rep. No. 294, 95th Cong., 1st Sess. 84-85, reprinted in 1977 U.S.Code Cong. & Ad.News at 1162-63
 
 
 [33]
 Final approval was not given to Connecticut's proposed revision until November 18, 1981. 46 Fed.Reg. 56,612 (1981)
 
 
 [34]
 Section 7401(b)(1) establishes the primary purpose of the Clean Air Act--"to protect and enhance the quality of the Nation's air resources."
 
 
 [35]
 See infra at 165-166,notes 40-41
 
 
 [36]
 See H.R.Rep. No. 294, 95th Cong., 1st Sess. 329-331, reprinted in 1977 U.S.Code Cong. & Ad.News at 1408-1410; H.R.Conf.Rep. No. 564, 95th Cong., 1st Sess. 145-46, reprinted in 1977 U.S.Code Cong. & Ad.News at 1526-27; S.Rep. No. 127, 95th Cong., 1st Sess. 41-42 (1977)
 
 
 [37]
 New York allows .1 pounds of particulate emissions per million British Thermal Units ("BTU's") of energy produced. EPA Technical Support Document, supra, "Attachment A," J.A. at 232. Connecticut's limit at the time EPA approved LILCO's special limitation was .2 pounds of TSP per million BTU's. On September 23, 1982, the limit was reduced to .14 pounds per million BTU's. Connecticut Air Pollution Control Regulations Sec. 19-508-18(d) (1980); see 46 Fed.Reg. 56,461 (1981); 47 Fed.Reg. 41,958 (1982)
 
 
 [38]
 Part D of the Clean Air Act, Secs. 7501-7508, requires each state to submit a so-called "non-attainment plan" detailing the measures which will be taken to bring "nonattainment areas" within the state into compliance with the NAAQSs
 
 
 [39]
 See Congressional reports cited supra note 36
 
 
 [40]
 See Cleveland Electric Illuminating Co. v. EPA, supra, 572 F.2d at 1155 (citing T. Lewis, M. Amdur, M. Fritzhand & K. Cambell, Toxicology of Atmospheric Sulfur Dioxide Decay Products 17 (1972))
 
 
 [41]
 These dangers include higher mortality rates, aggravation of heart and lung disease in the elderly, aggravation of asthma, excess risk of acute lower respiratory disease in children and excess risk of bronchitis. See id. at 1154
 
 
 [42]
 Letter from Raymond Driscoll, Manager Environmental Engineering Department, LILCO, to Robert Predale, Air Programs Branch, EPA, January 5, 1981, J.A. at 256
 
 
 [43]
 Id
 
 
 [44]
 Part C contains two subparts. We are concerned here only with Subpart I, Secs. 7470-7479, titled, appropriately, "Clean Air."
 
 
 [45]
 See Secs. 7471 and 7407(d)(1)(D) & (E)
 
 
 [46]
 40 C.F.R. Sec. 81.307 (1981)
 
 
 [47]
 Other provisions in Part C establish a permit program for preconstruction review of new and modified stationary sources of pollution. See Sec. 7475
 
 
 [48]
 This increment applies to Class II areas. Class II areas include all regions other than parks and wilderness areas which have not been redesignated. See Secs. 7472-73
 
 
 [49]
 See Congressional reports cited supra note 36
 
 
 [50]
 "Any State or political subdivision may petition the Administrator for a finding that any major source emits or would emit any air pollutant in violation of the prohibition of Sec. 7410(a)(2)(E)(i) of this title. Within 60 days after receipt of any petition under this subsection and after public hearing, the Administrator shall make a finding or deny the petition." Sec. 7426(b)
 
 
 [51]
 Indeed, we note that the House Conference Report accompanying the 1977 Amendments specifically rejected an earlier Senate proposal which would have made the Agency's failure to make a finding in response to a Sec. 7426 petition equivalent to a finding that the challenged emissions would violate the Clean Air Act. H.R.Conf.Rep. No. 564, 95th Cong. 1st Sess. 145-46, reprinted in 1977 U.S.Code Cong. & Ad.News at 1526-27